# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

**ROBERT GARCIA,**

        **Plaintiff,**

**-vs-**                                                                     Case No.  2:05-cv-185-FtM-29DNF

**CENTEX REAL ESTATE CORPORATION, a Florida corporation, as the Managing General Partner of Centex Homes, A Nevada General Partnership,**

        **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

    This cause came on for consideration on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **MOTION TO COMPEL ARBITRATION (Doc. No. 3)** |
| **FILED:** | **April 28, 2005** |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

    In the Complaint which was removed from state court, Plaintiff, Robert Garcia ("Garcia") alleges that Defendant, Centex Real Estate Corporation ("Centex") failed to pay him the commissions he earned on homes that he sold for them. Centex filed a Motion to Compel Arbitration (Doc. 3) on April 28, 2005, and Garcia filed a Response (Doc. 11) on June 1, 2005. The Honorable John E. Steele, United States District Judge entered an Order (Doc. 24) on June 23, 2005, referring the Motion to

Compel Arbitration to this Court for a Report and Recommendation. Centex argues that the claims raised in the Complaint should be submitted to arbitration. Garcia asserts that no agreement was entered into by the parties which would compel arbitration in this matter. The overriding issue is whether a valid and binding agreement was entered into by the parties which included an arbitration clause. An evidentiary hearing was held on August 31, 2005.

**I.  Centex's Witnesses**

Centex presented Michael Mcleod ("Mcleod") as its first witness. Mcleod is the Division Chief Financial Officer for Centex Homes, Southwest Florida Division. (Tr[1]. p. 8). Mcleod testified that Garcia was an employee of Centex in the Naples Division which became part of the Southwest Florida Division. (Tr. p. 9). During 2000 through 2001, Mcleod was the controller for that Division. (Tr. p. 9). In 2001, Centex conducted a scheduled comprehensive audit of the operations and accounting areas which occurs every three to four years. (Tr. p. 9-10). The audit was also a peer review in that employees from other divisions conducted the audit. (Tr. p. 11). The auditors produce an Audit Report. (Tr. p. 11). (A portion of the Audit Report was entered as Def. Exh. 1). The Audit Report was a score card indicating how each department was performing. (Tr. p. 12).

Mcleod testified that as a part of the audit, it was very important that all sales counselors sign the 1999 Sales Counselor Employment and Compensation Policies ("Agreement") document. (Tr. p. 22-23). (A copy of the Agreement is Def. Exh. 3). Mcleod testified that it would be problematic if a sales counselor refused to sign the Agreement. (Tr. p. 23). A sales counselor may be terminated for

---

[1] "Tr." refers to the transcript of the evidentiary hearing. (Doc. 41).

his refusal. (Tr. p. 23). Mcleod reviewed the Audit Review Workpapers, specifically the Work Program. (Tr. p. 27). (See, Def. Exh. 1). Number 31, states:

> Inquire of the division sales manager whether the items below are performed and/or documented in each salesperson's personnel file. Determine and document how the sales manager uses the various evaluation mediums as constructive tools to assist the division's salespersons.
>
> a. Sales Compensation Agreement.

In the third column are the initials "RC" which Mcleod testified were Rick Clark's initials. (Tr. p. 27).

Rick Clark ("Clark") testified that he is employed by Centex as the Assistant Land Acquisition Manager for the Charlotte, North Carolina Division. (Tr. p. 116). From 2000 to 2001, he was the Assistant Sales Manager for the Charlotte Division. (Tr. p. 116). He also was an auditor for the 2001 Audit of the Naples Division. (Tr. p. 116). As an auditor of the sales department, his job was to walk through all of the sales offices, and look through the files. (Tr. p. 116-117). Clark testified that audits were extremely important. (Tr. p. 118). Of all the documents in the personnel files, the Agreement was one of the most important documents to have signed. (Tr. p. 119).

For the audit, Clark looked at every personnel file that was given to him. (Tr. p. 120). He did not know if he was given every personnel file, and could not remember if he had seen Garcia's file. (Tr. p. 123-124). He checked to make sure that the Agreement was in the file, and that each person had signed the Agreement. (Tr. p. 120). If an Agreement had been missing, he would have noted it and it would have affected the score given to the division. (Tr. p. 121). Clark testified that he verified that the weekly sales persons' reviews were in the personnel files, as well as the annual reviews. (Tr. p. 125). This was the only audit he ever conducted. (Tr. p. 122).

Paul Rondeau ("Rondeau"), the Director of Sales and Marketing for the Southwest Division testified that he was responsible for the sales and marketing departments. (Tr. p. 32-33). Julie Oney

and a new sales manager, Leslie Hawley helped him to prepare his department for the audit in 2001. (Tr. p. 34). In his preparation, Rondeau presented the Agreement to his sales staff at a meeting in early December 2000. (Tr. p. 35). He asked the sales counselors to review the Agreement. (Tr. p. 43). The reason the Agreements were drafted in 1999 but not signed until 2000 was that some Agreements were signed earlier, but Rondeau had all the sales counselors sign the Agreements again for the audit. (Tr. p. 50). Rondeau admitted that in the past, there were salespeople who worked for Centex without a signed Agreement. (Tr. p. 60). However, he also testified that if a sales counselor refused to sign the Agreement, the sales counselor would not be permitted to work for Centex. (Tr. p. 60).

Rondeau testified that Leslie Hawley went to each of the satellite offices to collect the signed Agreements. (Tr. p. 35). It was her responsibility to get the Sales Counselors to sign the Agreement. Rondeau testified that at the audit, he brought the auditor every employee file for the nine sales people in his department. (Tr. p. 38). Rondeau stated that he knew that he had a signed Agreement from Garcia before the audit.(Tr. p. 41). The reason he knew that he had a signed Agreement from Garcia is because Garcia was on probation at the time, and Garcia was being watched more closely. (Tr. p. 42). Rondeau admitted that Garcia was a big producer for Centex. (Tr. p. 56). Rondeau testified that he did not know where Garcia's Agreement was, and why it was not in Garcia's personnel file. (Tr. p. 47).

Rondeau testified that he did not conduct weekly sales person reviews even though it was required for the audit.(Tr. p. 53). He stated that for the purposes of the audit, he was required to have a policy in place for weekly meetings, but he did not have to show that he had conducted these meetings. (Tr. p. 52, 57). He did not know if documents from weekly meetings were kept in personnel files. (Tr. p. 54).

During the audit, Rondeau brought the auditor all of the personnel files. (Tr. p. 39). The auditor reviewed each of the personnel files, and verified that the Agreement was signed for each salesperson. (Tr. p. 39, 41). Rondeau testified that the auditor reviewed Garcia's personnel file. (Tr. p. 41).

Julie Oney ("Oney") testified that she is the Director of Sales Administration for Centex. (Tr. p. 64). She kept all personnel files. (Tr. p. 64). She began preparing for the 2001 Audit in November and December of 2000. (Tr. p. 65). Oney created checklists to make sure that everyone had signed the Agreement. (Tr. p. 68). It was Leslie Hawley's responsibility to obtain all signed Agreements from the sales counselors. (Tr. p. 65-66). After the Agreements were signed, Oney kept the Agreements in the personnel files that were kept in an unlocked cabinet in her office. (Tr. p. 66). She testified that all sales counselors knew where the personnel files were kept in her office, including Garcia. (Tr. p. 66, 67-68).

Oney was also responsible for drafting the Policies and Procedures Manual, and discussed the Policies and Procedures Manual at a sales meeting. (Tr. p. 69). (See, Def. Exh. 2). The Policies and Procedures Manual contained the Agreement on page 58 of the Manual. (Tr. p. 69, 71). Garcia signed a receipt showing that he received the Policies and Procedures Manual on March 2, 2001. (Tr. p. 72). (See, Def. Exh. 2).

Prior to the 2001 Audit, Oney printed the Agreement for all of the sales counselors to sign. (Tr. p. 78). The Agreement was presented to the sales counselors during a meeting.(Tr. p. 78). Oney does not know when Garcia's Agreement became missing. (Tr. p. 82). During the 2001 Audit, Oney took all of the personnel files to the auditor. (Tr. p. 74). The weekly reviews were not kept in the personnel files, but rather Leslie Hawley kept them in a notebook. (Tr. p. 86).

On the day Garcia quit, Oney testified that he sat in her office all morning. (Tr. p. 74). He was in her office even when she stepped out of the office. (Tr. p. 74). She never asked him to leave her office. (Tr. p. 75). Oney knew that Garcia had given his notice, but she still allowed him to remain in her office. (Tr. p. 76). Oney was upset with Garcia for quitting, because he had just closed on his house from Centex and got an employee discount on the house. (Tr. p. 74).

Leslie Hawley ("Hawley") testified that she is employed by Centex as the Area Sales Manager. (Tr. p. 92). She manages all of the sales people which includes their training, reviews, and getting paperwork signed. (Tr. p. 92). She supervised Garcia prior to his leaving Centex. (Tr. p. 92).

For the 2001 Audit, she had a checklist of items to accomplish. (Tr. p. 93). One of her most important tasks was to get the Sales Compensation Agreements signed before the audit. (Tr. p. 93). She had most of them signed by the end of December 2000. (Tr. p. 93). On December 20, 2000, she brought the Sales Agreement to Garcia at his office in Autumn Woods. (Tr. p. 94-95). She had to have three people at Autumn Woods sign the Agreement. (Tr. p. 95). Garcia was one of the three on her list. (Tr. p. 95). She especially remembers that Garcia signed the Agreement because he was on probation at the time. (Tr. p. 95-96). Garcia also helped her clean the Autumn Woods Office as well as his own office. (Tr. p. 96). At the Autumn Woods office on December 20, 2000, she handed Chris Adkins, Linda Noonan, and Garcia the Agreement, and had them all sign separate Agreements. (Tr. p. 98-99). After Garcia signed the Agreement, Hawley testified that she took the signed Agreement back to the main office, checked off Garcia's name from a checklist, and gave the Agreement to Oney. (Tr. p. 97).

Hawley conducted weekly reviews. (Tr. p. 100). She kept all documentation of the weekly reviews in a notebook that she kept with her. (Tr. p. 100). Hawley had four or five weekly reviews

for Garcia. (Tr. p. 101). She did quarterly reviews in March 2001.(Tr. p. 101). Hawley had Garcia sign the Policies and Procedures Manual and gave the signed copy to Oney. (Tr. p. 103). His signature on the receipt indicated that he had received the Policies and Procedures Manual and read it. (Tr. p. 103). On the day Garcia quit, Hawley saw him in the lobby of the main office, where he told her he was quitting, and she later saw him in Oney's office. (Tr. p. 97).

Chris Adkins testified that he is employed by Centex as a sales counselor. (Tr. p. 107). He worked at the Autumn Woods office with Garcia. (Tr. p. 107). On December 20, 2000 he had a meeting with Hawley, and signed the Agreement. (Tr. p. 108-109, 112). He also testified that he had been in Oney's office but had never had her pull his personnel file, and was not sure where personnel files were kept. (Tr. p. 114).

### II. Garcia's Witnesses

Plaintiff, Robert Garcia testified that he is a real estate broker, and had worked for Centex for eight years. (Tr. p. 130-131). He now works for a competitor of Centex. (Tr. p. 141). He testified that while he was with Centex, he signed two Agreements in 1994 and 1995. (Tr. p. 131). He emphatically testified that he did not sign any other Agreement, and that he never signed the 1999 Agreement. (Tr. p. 131). He admitted that he met with Hawley on December 20, 2000, but he had never received an Agreement prior to that meeting, and he did not sign an Agreement on that date. (Tr. p. 132). In fact, he had decided to leave Centex in December 2000, so he would not have signed the Agreement at that time because he knew he would not have received his commissions if he would have signed the Agreement. (Tr. p. 133). Garcia admitted that he waited until March 2001 to leave Centex because he was waiting until he closed on his house, and he wanted to wait until the end of

season. (Tr. p. 140-141). He did receive the Policies and Procedures Manual at a sales meeting. (Tr. p. 133). He remembered signing a receipt for it. (Tr. p. 133).

On March 30, 2001, Garcia resigned from his position at Centex. (Tr. p. 134). At 8:00 a.m. he went to the main office and went to the break room. (Tr. p. 134). He does not recall seeing Hawley in the lobby. (Tr. p. 134). He did see Tim Ruemler who was the President of the Naples Division. (Tr. p. 134). He told Ruemler that he was leaving the company and requested an exit interview. (Tr. p. 135). Ruemler met Garcia in the conference room for the exit interview. (Tr. p. 135). Garcia gave Rondeau his termination letter which included a request to be paid for his commissions. He never went into Oney's office on that date, and had no idea where his employment files were located. (Tr. p. 135, 139). Garcia provided Rondeau with a termination letter. (Tr. p. 136). At 9:30 a.m., Garcia went to Autumn Woods. (Tr. p. 136).

Between 9:30 and 10:00, Garcia met with Rondeau at Autumn Woods and Rondeau told him that Rondeau would "fight to his very last breath" to make sure that Garcia was not paid his commissions. (Tr. p. 136-137). Garcia testified again that he never signed the 1999 Agreement and never signed any agreement that would require him to go to arbitration. (Tr. p. 137).

Linda Noonan ("Noonan") testified that she worked at Centex in the Autumn Woods office with Garcia. (Tr. p. 142). While she was with Centex, she signed three agreements. (Tr. p. 142). She did not sign an Agreement on December 20, 2000, because she was not in the office that day. (Tr. p. 143, 144). Noonan testified that she was not given weekly sales reviews or annual sales reviews since 1998. (Tr. p. 143). Noonan did not know where Centex stored her personnel file. (Tr. p. 144).

### III. Analysis

Centex argues that even though it cannot find the signed Agreement by Garcia, the Agreement should be enforceable against him because they have witnesses who saw him sign the Agreement and saw a signed Agreement by him. Centex also argues that Garcia should be bound by the Agreement because he signed a receipt for the Policies and Procedures Manual and the Agreement was included in the Manual. Garcia asserts that he never intended to sign an Agreement, never signed an Agreement, and should not be bound by the 1999 Agreement.

In diversity cases, federal courts apply the substantive law of the forum state unless federal constitutional or statutory law requires a different result. *Galindo v. Air Mutual Insurance Company*, 203 F.3d 771, 774-5 (11th Cir. 2000). In deciding whether a valid agreement to arbitrate exists, courts must apply ordinary state common law governing the issue of formation of contracts to determine the issue. *Taylor v. First North American Nat. Bank*, 325 F.Supp.2d 1304, 1309-10 (M.D. Ala. 2004). Florida courts apply general principles of contract law to determine who is bound by an arbitration clause. *Id.*, *See also, Florida Power Corp. v. City of Casselberry,* 793 So.2d 1174, 1178 (Fla. 5th DCA 2001)*.* The party that is attempting to enforce the agreement has the burden of proof to establish that "an enforceable written agreement to arbitrate existed between the parties." *Shearson, Lehman, Hutton, Inc. v. Lifshutz*, 595 So.2d 996, 997 (Fla. 4th DCA 1992). Florida courts resolve doubts as to the scope of an agreement to arbitrate in favor of arbitration. *Id.*, *citing*, *Info. Tech & Eng'g Corp. v. Reno*, 813 So.2d 1053 (Fla. 4th DCA 2002). Courts look to the intent of the parties to determine if a particular dispute should be arbitrated. *Florida Power Corp. v. City of Casselberry*, 793 So.2d at 1178.

To determine a motion to compel arbitration, "a court must consider: (1) whether the parties have entered into a valid arbitration agreement, (2) whether an arbitrable issue exists, and (3) whether the right to arbitration has been waived." *Travelers Insurance Co. v. Irby Construction Co., Inc.*, 816 So.2d 829, 830 (Fla. 3rd DCA 2002), *See also*, *Florida Power Corp. v. City of Casselberry*, 793 So.2d at 1178-9. Further, a court must determine disputed issues concerning arbitration in an expedited evidentiary hearing. *Id*.

> Fla. Stat. §682.02 provides in part that
>
> [t]wo or more parties may agree in writing to submit to arbitration any controversy existing between them at the time of the agreement, or they may include in a written contract a provision for the settlement by arbitration of any controversy thereafter arising between them relating to such contract or the failure or refusal to perform the whole or any party thereof.

The statute only requires that the agreement be in writing, it does not specifically require that the written agreement be executed.

Under Florida law, an unsigned contract may be binding on a party "if the evidence supports that they acted as if the provisions of the contract were in force." *Sosa v. Shearform Manufacturing*, 784 So.2d 609, 610 (Fla. 5th DCA 2001). Courts look to whether both parties performed under the unsigned contract. *Consolidated Resources Healthcare Fund I, LTD v. Fenelus*, 853 So.2d 500, 503 (4th DCA 2003). "'The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, for example by the acts or conduct of the parties.'" *Id*., *citing, Integrated Health Services of Green Briar, Inc. v. Lopez-Silvero*, 827 So.2d 338 (Fla. 3rd DCA 2002). If the arbitration clause is part of unsigned agreement, and the evidence supports a finding that the parties agreed to be bound by the unsigned contract, then the arbitration clause is enforceable. *H.W. Gay Enterprises, Inc. v. John Hall Electrical Contracting*, 792 So.2d 580 (Fla. 4th DCA 2001).

The case of *Steve Owren, Inc. v. Connolly*, 877 So.2d 918 (Fla.. 4th DCA 2004) is analogous to the instant case. In the *Steve Owren, Inc.* case, a real estate agent testified that she never signed the employment agreement with the arbitration clause. *Id*. at 919. She did not say that she had no memory of signing it, rather she stated emphatically that she did not sign it and never agreed to arbitration. *Id*. The broker put on evidence of habit and practice that it was necessary for all agents to sign the agreement, and that it must have been in her file even though it was not produced at the hearing. *Id*. at 920. No one testified that they saw the agent sign the document and no one remembered seeing the document with her signature on it. *Id*. at 919-20. The broker argued on appeal that the arbitration clause should be enforced because the agent worked at the agency for two years, and accepted the benefits of employment with the broker for that period of time. *Id.* at 920. The court rejected that argument that the mere performance of her job would infer an assent to an arbitration provision. *Id*. at 920-21.

The parties are in dispute as to whether a valid arbitration agreement exists. Garcia has not raised any arguments concerning whether an arbitrable issue exists or whether the right to arbitration has been waived. The Court will focus on whether a valid agreement to arbitrate exists. The Court must keep in mind that the burden in this case lies with Centex to show that the parties entered into a valid agreement to arbitrate. The testimony from the present Centex employees, although consistent, contradicts the testimony of Garcia concerning whether he ever signed a 1999 Agreement. Hawley testified that she saw Garcia sign an Agreement. Rondeau testified that he knew he had a signed Agreement from Garcia because of Garcia being on probation. Clark testified that every personnel file he reviewed had a signed Agreement, but admitted that he did not know if he reviewed Garcia's personnel file. None of the Centex employees could explain where Garcia's signed Agreement was,

but Oney did imply that Garcia had access to his personnel file on the day that he quit because he was allegedly in her office for hours on that day, even when she was not present in her office. Garcia, Noonan and Adkins all testified that they had no knowledge of where personnel files were kept.

Garcia, on the other hand, testified emphatically that he never signed a 1999 Agreement. He explained that in December 2000 he knew that he was leaving Centex. He was only staying with Centex until the house he bought through Centex was completed, and until season was over. He also knew that if he signed the 1999 Agreement, he would lose all of the commissions that were pending as of his last day.

Without a signed Agreement, Centex must show that Garcia acted as if the provisions of the Agreement were in force. However, mere continued performance of a job, does not constitute evidence that Garcia assented to the terms, including the arbitration clause, of the Agreement. *Steve Owren, Inc. v. Connolly*, 877 So.2d 918, 920-21 (Fla.. 4th DCA 2004). Centex produced witnesses who testified that they either saw Garcia sign an Agreement, or saw the signed Agreement. However, this supposed signed Agreement cannot be produced. Garcia emphatically denies signing an Agreement. Centex did not produce any evidence that Garcia acted as if an Agreement was signed. He continued to perform his job as he had for the years prior when he was working under an old agreement or no agreement. Centex has not shown that Garcia acted as if the provisions of the Agreement were in force.

Centex also argues that by Garcia signing a receipt for the Policies and Procedures Manual, he agreed to the arbitration provision because the Agreement is contained in the Policies and Procedures Manual. Centex asserts that they offered the arbitration provision to the sales counselors in the 1999 Agreement, and Garcia accepted it when he signed the receipt for the Policies and

Procedures Manual. The language in the receipt, however, simply states that the individual that signs the receipt has received the Policies and Procedures Manual. It does not state that the person agrees to all the term and conditions in the Policies and Procedures Manual. Further, courts in Florida have a "decided reluctance" to find the provisions of an employee handbook or a policies and procedures manual "rise to the level of enforceable contract rights" although "courts have acknowledged it is possible for such handbooks or manuals to create enforceable rights if there is 'language in the employee manual expressly providing that the manual constitutes a separate employment agreement' or the parties have reached a mutual agreement to this effect." *Walton v. Health Care District of Palm Beach County, Florida,* 862 So.2d 852, 855-56 (Fla. 4th DCA 2003), citing *Quaker Oats Co. v. Jewell*, 818 So.2d 574, 578 (Fla. 5th DCA 2002).

Centex cites to two cases to support its proposition that signing a receipt for an employee handbook binds the person to an arbitration clause. In the case of *Chanchani v. Salomon/Smith Barney, Inc.*, 2001 WL 204214 (S.D. N.Y 2001[2]), the District Court held that by signing a receipt for an Employee Handbook, the plaintiffs were bound by the arbitration clause. *Chanchani*, is distinguishable from the instant case in that the receipt contained language that the employee would comply with the terms and conditions of the Policies and Procedures of the company. *Id*. at *2-3. In the instant case, Garcia's receipt only acknowledged that he received the Policies and Procedures

---

[2] This Court notes that this case is from the Southern District of New York. The court in that case noted that its district routinely upholds arbitration agreements contained in employee handbooks when an employee has signed an acknowledgment form. *Chanchani v. Salomon/Smith Barney, Inc.*, 2001 WL 204214, *3 (S.D. N.Y. 2001). The Court finds that the Middle District of Florida requires more than a mere acknowledgment. *See*, *Lemmon v. Lincoln Property Co.*, 307 F.Supp.2d 1352, 1355 (M.D. Fla. 2004) (Count found mutuality of obligation when employee signed an acknowledgment acknowledging receipt of handbook <u>and</u> the acknowledgment had language agreeing to arbitrate any employment complaints.)

Manual. In the second case, *KFC National Management Co. v. Beauregard*, 739 So.2d 630, 630-31 (Fla. 5th DCA 1999), plaintiff signed an application for transfer which contained an arbitration clause. She also signed an "'Acknowledgment of Receipt'" of a KFC employee handbook, and this handbook included an arbitration clause. *Id.* at 631. Even though the arbitration agreements were signed after the incident occurred but before the claim was lodged, the court enforced the arbitration clause retroactively based upon the unambiguousness of the language of the application for transfer and the handbook of the intent that employment-related disputes be arbitrated. *Id.*

The only signed agreement in this case does not expressly state that Garcia agreed to be bound by the terms of the Agreement. The Court finds that the receipt signed by Garcia states that he received the Policies and Procedures Manual, but does not express mutual assent to all of the terms and condition of the Policies and Procedures Manual. In essence, Centex is asking that the Court find Garcia bound to the terms of the Agreement by signing a receipt acknowledging that he received the Policies and Procedures Manual which contained an unsigned Agreement. The Court concludes that Garcia's signature on the receipt does not bind him to the arbitration clause in the Agreement because of the lack of mutuality of obligation.

The Court further concludes that Centex has not met its burden of showing that the parties entered into a valid arbitration agreement. Therefore, it is respectfully recommended that the Motion to Compel Arbitration (Doc. 3) be denied.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this <u>4th</u> day of <u>October</u> 2005.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies:
All Parties of Record

Respectfully recommended in Chambers in Ft. Myers, Florida this <u>4th</u> day of <u>October</u> 2005.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies:
All Parties of Record